OAO91 (Rev. 12/03) Criminal Complaint

# UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA
V.
HECTOR FIGUEROA, a/k/a BORI
DOB 1983
Pawtucket, RI

(Name and Address of Defendant)

## CRIMINAL COMPLAINT

Case Number: 1:08-MJ55M

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about date unknown and continuing to 3/26/2008 (Date) in ______ County, in the ______ District of RHODE ISLAND defendant(s) did,

(Track Statutory Language of Offense)
knowingly, intentionally and wilfully combine, conspire, confederate and agree with others known and unknown to knowingly and intentionally distribute 100 grams or more of heroin, a Schedule I Controlled Substance,

in violation of Title 21 United States Code, Section(s) 841(a)(1), (b)(1)(B) & 846 .
I further state that I am a(n) Task Force Agent, DEA (Official Title) and that this complaint is based on the following facts:

See attached affidavit of ~~Robert Enright~~ DENNIS SMITH, Task Force Agent, Drug Enforcement Administration; Detective, ~~Providence~~ PAWTUCKET Police Department.

Continued on the attached sheet and made a part of this complaint: [X] Yes [ ] No

Signature of Complainant

Task Force Agent ~~Robert Enright~~ DENNIS SMITH
Printed Name of Complainant

Sworn to before me and signed in my presence,

3-27-08 at Providence Rhode Island
Date City State

DAVID L. MARTIN UNITED STATES MAGISTRATE JUDGE
Name of Judge Title of Judge

Signature of Judge

# AFFIDAVIT

1. I, Dennis Smith, am a Task Force Agent (TFA) with the U.S. Drug Enforcement Administration (DEA) Taskforce, currently employed by the Pawtucket Police Department, Pawtucket, Rhode Island. As a Task Force Agent, I am empowered by Title 21, Section 878 of the United States Code to effect arrests, searches, and seizures for violations of the federal narcotics laws. During my tenure as a Task Force Agent with the DEA, I have participated in numerous narcotic investigations. I have been the Affiant on numerous arrest warrant affidavits. I have conducted physical and wire surveillance, executed search warrants, reviewed and analyzed taped conversations and records of drug traffickers, and interviewed users and distributors of illicit drugs. Therefore, I am familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, and the efforts of persons involved in such activity to avoid detection by law enforcement, as well as methods used to finance drug transactions and launder drug proceeds. Your affiant has participated in prior wiretap investigations, including serving as a monitor in the listening post ("wire room"). As a result of these experiences, your affiant has become familiar with the use of pagers and telephones used by drug traffickers to communicate, the patterns of activity of drug traffickers, the types and amounts of profits made by drug dealers, and the methods, language and terms that are used to disguise the source and nature of the profits from their illegal drug dealings. Additionally, based on my training and experience and my participation in other narcotics investigations, your affiant knows the following: that it is common for drug dealers to "front," or provide on consignment, controlled substances to their customers; that it is common for drug dealers to conceal contraband, proceeds of drug sales and records of drug transactions in secure locations within their residence, vehicles and/or businesses for ready access; to conceal proceeds

from law enforcement authorities and rival narcotics traffickers; that drug dealers routinely use digital display paging devices (or beepers) and cellular telephones to facilitate their drug distribution operations; that drug dealing is an ongoing process that requires the development, use and protection of a communication network to facilitate daily drug distribution; that drug dealers use contact pagers and telephones to thwart law enforcement efforts to penetrate the drug dealers' communication network; that narcotics traffickers frequently transmit to one another prearranged numeric codes, specifically to indicate the quantity and/or price of narcotics, or a predetermined code to identify the caller; and that narcotics traffickers commonly used coded language when speaking with other drug traffickers in order to thwart detection by law enforcement agents who may be intercepting their communications. Based on my familiarity with DEA investigations generally, drug dealers frequently refer to heroin in guarded conversations. The code words are used to disguise the actual nature of the conversations. Codes are commonly accepted among drug traffickers and provide a level of comfort to drug traffickers as they feel it will help avoid detection by law enforcement.

2. The following information is based upon my personal knowledge as well as information provided to me by other agents and is presented in support of a complaint and arrest warrant for Hector Figueroa a/k/a BORI, for whom there is probable cause to believe has conspired to distribute 100 grams or more of heroin in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846. Since this affidavit is being submitted for the limited purpose of establishing probable cause, your Affiant has not included each and every fact known regarding the instant investigation. More specifically, your Affiant has set forth only pertinent facts that your Affiant believes are necessary to establish probable cause.

3. In 2007 and 2008, agents with the DEA began to conduct an investigation into a

narcotics trafficking organization involving Hector Figueroa a/k/a BORI (hereinafter BORI), Angel Figueroa a/k/a PIYI (hereinafter PIYI), Pedro Ramos (hereinafter RAMOS), Rosalin Chavez (hereinafter CHAVEZ) and others. On February 15, 2008, pursuant to an order of the U.S. District Court for the District of Rhode Island, the DEA began to intercept telephone calls occurring over telephone number 401-215-7914 (**Target Telephone #1**), a number subscribed to and used by Hector Figueroa a/k/a BORI, and 401-499-2614 (**Target Telephone #2**), a number subscribed to Pedro Ramos and used by RAMOS and CHAVEZ. On March 13, 2008, the DEA applied for and received authorization to continue to intercept telephone calls over **Target Telephone #1**.

5. As part of the investigation into the above-named subjects and others, your affiant learned that BORI lives at 40 Dickens Street, Pawtucket, RI, PIYI lives at 24 Hampton Street (Basement Apartment), Providence, RI, and RAMOS and CHAVEZ live at 142 Atlantic Avenue (Basement Apartment), Providence, RI.

6. Intercepted telephone calls over **Target Telephone #1** have confirmed that BORI uses runners to distribute heroin. For example, on February 18, 2008, at approximately 12:19 p.m., BORI, using **Target Telephone #1**, received an incoming call from 787-432-9333 and spoke to an unidentified male (UM). During this conversation, BORI told the UM to go to "Palm with 5, a violet mini-van." After this call was intercepted, surveillance teams, including your affiant, observed a violet mini-van with a female inside parked on Palm Street. Two Hispanic men, believed to be BORI's runners, met with the female and then walked back to Privet Street. Surveillance followed the violet mini-van, which was stopped by officers in Providence, RI. TFA Smith found 5 wax packages of heroin inside a Newport cigarette box on the front seat of the mini-van. The heroin field tested positive for heroin and was sent to the

Northeast Regional Laboratory. The female told TFA Smith that she had arranged the purchase of heroin by calling 401-256-3859 and placing an order with a male. The male told her to go to Palm Street, where two Hispanic men sold her 5 packages of heroin for $100. The search of the vehicle was based upon intercepts and physical surveillance.

7. On February 19, 2008, at approximately 10:17 a.m., BORI, using **Target Telephone #1**, made an outgoing call to 787-432-9333 and spoke to an unidentified male (UM) addressed as "GORDO." During this conversation, BORI told GORDO to go to "Beecher" for 3 and meet a grey Ranger. Agents believe that during this conversation, BORI told a runner to go to Beecher Avenue in Pawtucket, RI to deliver 3 packages of heroin to a customer who was operating a grey Ranger. After this call was intercepted, surveillance teams observed a Hispanic man, believed to be one of the same two Hispanic men referenced in paragraph 6, approach the passenger window of a grey Ranger and engage in a hand-to-hand transaction with the passenger of the Ranger. After approaching the truck, the man walked back to Privet Street. Based upon his experience, TFA Smith believes this was a heroin sale. There were several other calls similar to this one between BORI and the individuals believed to be the runners at Privet Street. At 12:18 p.m., on February 19, 2008, BORI was observed arriving at 28 Privet Street, Pawtucket, RI in a white Ford Expedition. He left at 12:59 p.m. and was followed from 28 Privet Street to 40 Dickens Street.

8. The telephone calls that have been intercepted over **Target Telephone #1** to date have assisted agents in identifying an individual named RICARDO QUEZADA a/k/a MONSTRO, who is believed to supply BORI with heroin. At 12:35 p.m. on February 18, 2008, **Target Telephone #1** received a call from 401-663-8239.[1] The individual who had been using

1 During the investigation, agents discovered that 401-663-8239 was a prepaid, cellular phone

401-663-8239 was known as MONSTRO. In this call, BORI told MONSTRO that he passed by the store and it was closed, that BORI was waiting for him. MONSTRO asked BORI if he was in the area and where does he want to send "that." BORI said let me call my brother to know where he is at. MONSTRO told BORI to call him back. Agents believe that during this call, MONSTRO informed BORI that he had heroin to give him. At 4:54 p.m. on February 18, 2008, BORI, using **Target Telephone #1**, called 401-919-1397 and spoke to PIYI. BORI said PIYI left some things back there, a box of Clorox and stuff. PIYI cussed, and said, he'll go get it tomorrow for (an unknown third party) to put it away. BORI told PIYI to call MONSTRO at 663-8239. PIYI then replied, "Call him yourself and have him swing by here." BORI again told him to call MONSTRO and come to an agreement with him. Agents believe that BORI told PIYI to call MONSTRO to finalize where they will meet, and PIYI told BORI to call MONSTRO.

9. On February 19, 2008, BORI, using **Target Telephone #1**, called PIYI at 401-919-1397. During this call, BORI told PIYI "hurry up" because there were 10 still left. BORI asked PIYI how much money MONSTRO gave him yesterday. PIYI replied, "50 dollars." Later in the call, BORI asked if PIYI talked to MONSTRO. PIYI said that he told MONSTRO that "but . . . for the week, ran out of everything." Later in the call, BORI stated that he will get the money for PIYI. Agents believe that BORI called PIYI and told him that there were 10 bags of heroin left. BORI asked PIYI how much heroin MONSTRO gave PIYI yesterday. Agents believe that when PIYI said, "50 dollars," he was telling BORI that he received 50 grams of heroin from MONSTRO. Later in the call, agents believe that PIYI told BORI that MONSTRO

---

subscribed to Jose Martinez. On March 7, 2008, the DEA was informed that 401-663-8239 was a suspended account.

ran out of heroin for the week. Agents also believe that BORI was telling PIYI that BORI would pick-up the heroin from PIYI.

10. On February 24, 2008, BORI, using **Target Telephone #1**, received a call from 401-663-8239. During this call, MONSTRO told BORI that the check already cleared. BORI asked how much MONSTRO will give him. MONSTRO told BORI that BORI's the one that "knows . . . (unintelligible) 200." BORI told MONSTRO to give him at least 150 so he can go shopping. MONSTRO agreed. BORI suggested that MONSTRO give him 200 pesos. MONSTRO agreed. Agents believe that during this call MONSTRO told BORI that he had heroin for sale. MONSTRO agreed to give BORI 200 grams.

11. On February 24, 2008, BORI, using **Target Telephone #1**, called PIYI at 401-919-1397. BORI asked PIYI what he was doing. PIYI was at home. BORI said, "Right now . . . I'm going to call you for that." PIYI asked what. BORI said, "They are going to call me for that." PIYI told BORI to have him stop over by the house. BORI stated, that is not "MONSTRO" (monster), the one who is coming is going to be the young guy. PIYI told BORI that he should call him (PIYI). BORI agreed. Agents believe that during this conversation, BORI told PIYI that when MONSTRO was ready to give BORI the heroin, he could call BORI. Agents believe that PIYI told BORI to tell MONSTRO to meet PIYI at PIYI's house. BORI informed PIYI that one of MONSTRO's young runners will make the delivery.

12. A few minutes later on February 24, 2008, BORI, using **Target Telephone #1**, called MONSTRO at 401-663-8239. BORI told MONSTRO to go to the area and to call him when that is ready. MONSTRO asked BORI, is it the same one as always. BORI replied, "yes," and to call him. Agents believe that BORI told MONSTRO to "go to the area" where they usually conduct their drug deals when the heroin is ready. After several more calls in which

MONSTRO and BORI spoke regarding a meet between MONSTRO's runner and PIYI, BORI, using **Target Telephone #1**, called PIYI at 401-919-1397. BORI asked PIYI what those people (MONSTRO and others) gave him. PIYI answered 200. BORI acknowledged. Agents believe that this call reflects the fact that MONSTRO gave 200 grams of heroin to PIYI.

13. On March 19, 2008 at 12:27 p.m., BORI, using **Target Telephone #1**, called ANGEL FIGUEROA a/k/a PIYI at 401-919-1397. BORI asked PIYI what he was doing. PIYI said that he was at home. BORI asked how it was going. PIYI said that he was on the second one. PIYI said that there was half of one. PIYI said that he maybe would finish that and if the other one was gone fast, BORI should call that other one and give him PIYI's number. BORI asked who. PIYI replied, Pedro or one of those around there. BORI asked why. PIYI said he was on the streets and that in one of the streets there was a lady in a window that told him she had him on camera. BORI acknowledged. PIYI stated that he kept on going, but that if he would have told her that he was going to give her a hundred dollars, she would have stayed quiet. BORI said all right. Agents believe that during this conversation, PIYI, who was running drugs, told BORI that he had sold half of the second bag of heroin. PIYI also told BORI that a woman filmed him engaging in a drug transaction.

14. On March 20, 2008 at 2:02 p.m., BORI, using **Target Telephone #1** called PIYI, who was using 401-919-1397. BORI asked PIYI where he was. PIYI said that he was helping Miguel with the insurance. BORI asked PIYI if he took care of "that." PIYI said that he had "that" and he said that he was going to the house right now. BORI said that it was fine. Agents believe that during this conversation, BORI asked PIYI if PIYI had met with the runner of RICARDO QUEZADA a/k/a MONSTRO (based upon this call and previous interceptions). PIYI said that he had and that he would be taking the drugs to the house right now. A short time

later, surveillance teams observed PIYI arrive at his house, 24 Hampton Street (Basement Apartment), Providence, RI.

15. On March 23, 2008 at 3:51 p.m., BORI, using **Target Telephone #1**, received a telephone call from 401-243-5670, a number believed to be used by Carlitos, MONSTRO'S brother. Carlitos told BORI that his brother was in prison. He said that MONSTRO spoke with their father and said to tell you (BORI), "to lay low for a couple of days, to take it easy, to hide . . . ." BORI said, "for me to be careful?" Carlitos affirmed. Carlitos said that he was taken . . . but that he does not know what happened. BORI asked Carlitos if he was caught around here or if they went to look for him at the house. Carlitos said that the only thing that he knew was that they checked/searched the store for 20 minutes or so. BORI said, "okay."

16. Agents believe that in the above-described telephone call, Carlitos informed BORI of MONSTRO's arrest by DEA. On March 23, 2008, agents followed MONSTRO to a rest area along I-95 in Connecticut where MONSTRO was observed meeting with an individual now identified as Juan Antonio Lopez. Lopez was followed from the rest area and stopped. In his vehicle and on his person, agents seized over $16,000 in U.S. currency, much of which was in $20 bills. MONSTRO was followed back to Rhode Island and eventually stopped. He did not have any drugs on him at the time he was stopped. MONSTRO was questioned and then released early in the evening on March 23, 2008. Initially Lopez, who used an alias, denied meeting with MONSTRO. Eventually Lopez admitted that he met with MONSTRO to collect money for a kilogram of heroin that he had already provided to MONSTRO. Lopez told agents that he had dealt with MONSTRO more than six times in the past and that he sold MONSTRO a kilogram of heroin at a time.

17. On March 25, 2008, I obtained search warrants for BORI's residence at 40

Dickens Street, Pawtucket, RI; PIYI's residence at 24 Hampton Street (Basement Apartment), Providence, RI; and, RAMOS' and CHAVEZ's residence at 142 Atlantic Avenue (Basement Apartment), Providence, RI. On March 26, 2008, agents executed these warrants. When agents entered the basement apartment of 24 Hampton Street, PIYI was "bagging" heroin. In his pocket, PIYI had 4 bags of heroin. The heroin in each bag was divided into separate packets of heroin. There were 104 packets in total in PIYI's pocket. On the living room coffee table, agents found more heroin, a scale, and more empty baggies. There were 306 packets of heroin on the coffee table. The total quantity of heroin seized from PIYI and the coffee table was approximately 20 grams. The heroin field tested positive for heroin and will be sent to the Northeast Regional laboratory for additional testing. Based upon my training and experience, I know that 20 grams of heroin is a quantity typically held for distribution, not personal use. I also know that scales and baggies are common tools of the trade in the drug world.

18. In a kitchen cabinet, agents found 13 grams of crack cocaine, packaged in 2 clear, plastic baggies. Agents also found another scale and more small plastic baggies located in the kitchen cabinet with the crack cocaine. The crack cocaine field tested positive for cocaine and will be sent to the Northeast Regional Laboratory for further testing. Based upon my training and experience, I know that 13 grams of crack cocaine is a quantity typically held for distribution, not personal use.

19. While searching 40 Dickens Street, agents found paperwork in the name of Hector Figueroa, $160 in U.S. currency, and 2 cellular telephones. Prior to the execution of the search warrant, BORI exited 40 Dickens Street with an individual later identified as "GORDO." BORI and GORDO got into a Silver Infiniti, dealer plates of RI Reg. 515C, and drove away. Within several blocks of 40 Dickens Street, patrol officers stopped BORI's vehicle. During a

patdown search, officers found 1 cellular phone on BORI's person, which was **Target Telephone #1**, and 2 cellular phones in the car. The officers handcuffed BORI and brought him back to 40 Dickens Street, where he was orally advised of his constitutional rights. After I advised BORI of his constitutional rights, I asked BORI if he wanted to go to the police station and talk about this. BORI said, "yes."

20. BORI was taken to the police station. At the station, I asked BORI for consent to search the car dealership located at 1010 Plainfield Street, Johnston, RI and believed to be owned by BORI. BORI signed a written consent for 1010 Plainfield Street. BORI was taken to 1010 Plainfield Street. While at 1010 Plainfield Street, agents provided BORI with a written rights form. BORI signed the rights form admitting that he understood his rights. Agents searched 1010 Plainfield Street but did not find any narcotics. BORI pointed out the storage area next door and gave agents written consent to search his storage area located at 1074 Plainfield Street. No narcotics were found in the storage area. BORI was taken back to 1010 Plainfield Street and TFA Smith asked him whether he wanted to go to DEA to speak with agents. BORI agreed to go with agents. He was placed in TFA Michael Naylor's vehicle. At this time, TFA Naylor and TFA Charles Mulcahy drove BORI to the DEA office.

21. TFA Naylor and TFA Mulcahy engaged in a conversation with BORI during the car ride and at DEA. The conversation was surreptitiously recorded by TFA Naylor. During this conversation, BORI discussed with the agents why he had been targeted. At one point, BORI said, "I'm not a kilo guy, I'm a gram guy." TFA Naylor asked BORI if he dealt with 100 grams and BORI nodded. TFA Naylor asked him, "Did you ever do half a key?" BORI held up one finger. At another point in the conversation, TFA Naylor asked BORI, "how many drug dealers do you know, 100, 200?" BORI said, "yes." BORI said that he knew he was going to be at

"Wyatt" and he knew it was coming. BORI said, if you "play with fire, you're gonna get burned." In response to a question of TFA Naylor's, BORI asked, "How much money did I blow?" He then proceeded to list some of his expenditures. He said he spent $1,500 every weekend at a club. He said he bought rims for his car. BORI discussed having a $40,000 motorcycle and said he had "26g's" into a black bike. BORI agreed with TFA Naylor's statement that he had made enough money to buy a $300,000 house in Florida. BORI said he spent $600 a week at Homewood Suites, a hotel where he took women. He also admitted that he spent $600 every 2 weeks on sneakers and that he had $1,500 worth of sweaters and jackets, but that he had not "worn them." At another point in this conversation, BORI claimed to have worked at a factory several years back. TFA Naylor asked BORI, "Did you sling on the side...?" BORI said that he "got laid off, had to do something." TFA Naylor later asked BORI, "Had a good run for 3 years?" BORI answered, "yep." At some point, TFA Naylor said to him, "you weren't slinging on the street yourself?" BORI said, "yeah." BORI claimed to have started in the "Manton Projects" with a "baseball bat." At some point, TFA Naylor asked him, "slinging crack or heroin?" BORI responded, "heroin." At another point in the conversation, TFA Naylor said to BORI, "like you said to me, 'I'm a 100 gram guy." BORI nodded. Sometime later, the conversation ended.

22. Based upon all of the above, I submit that there is probable cause to believe that beginning on or about a date unknown and continuing until on or about March 26, 2008, Hector Figueroa a/k/a BORI, did conspire with others known and unknown to distribute 100 grams of more of heroin in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846.

Dennis Smith, Task Force Agent
DEA Taskforce

Sworn and subscribed to before me this the 27th day of March, 2008 at Providence, Rhode Island.

David L. Martin
United States Magistrate Judge
United States District Court